**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 53056**

| | | |
|---|---|---|
| In the Matter of:  Jane Doe I, A Child Under Eighteen (18) Years of Age. | ) ) ) | |
| STATE OF IDAHO, DEPARTMENT OF HEALTH AND WELFARE, | ) ) ) | Opinion Filed:  December 8, 2025 |
| Petitioner-Respondent, | ) ) | Melanie Gagnepain, Clerk |
| v. | ) ) | |
| JOHN DOE (2025-27), | ) ) | |
| Respondent-Appellant. | ) ) | |

Appeal from the Magistrate Division of the District Court of the Third Judicial District, State of Idaho, Canyon County.  Hon. Courtnie R. Tucker, Magistrate.

Judgment terminating parental rights, <u>affirmed</u>.

Eric D. Fredericksen, State Public Defender; Brigette Borup, Deputy Public Defender, Caldwell, for appellant.

Hon. Raúl R. Labrador, Attorney General; Christopher Sletvold, Deputy Attorney General, Caldwell, for respondent.

_____

HUSKEY, Judge

John Doe appeals from the magistrate court's judgment terminating his parental rights. Doe argues the magistrate court erred in terminating his parental rights based solely on his chronic medical conditions.  The Idaho Department of Health and Welfare (Department) argues the magistrate court did not err.  We hold the magistrate court did not err in concluding Doe neglected Jane Doe I (Child) and was unable to discharge his parental responsibilities.  Thus, termination of Doe's parental rights is in the best interests of Child.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

Doe is the biological father of Child. Law enforcement was called to do a welfare check on Child, then eight years of age, based on reports of unsanitary living conditions and concerns that Child was required to serve as a caregiver to Doe, who was chronically ill. Upon arriving at Doe's home, where Child lived, law enforcement found the home so filthy that parts of it were unusable. For example, in Child's bedroom, there were puddles of vomit on the floor that were weeks old; the stains and smells continued throughout Child's bedroom, Doe's bedroom, and Doe's bathroom, which Child was required to use. At the time of Child's removal, Doe was a patient at a local hospital and had been for some time. Law enforcement contacted Doe, and he acknowledged the home was dirty, but explained he had tried to supervise Child cleaning the house. Doe also acknowledged that he had Child help him with basic care tasks he is unable to do because of his medical condition. Doe confirmed that Child had been staying with a neighbor while he was hospitalized. Based on Doe's inability to care for Child, the condition of the home, and Doe's confirmed use of controlled substances, Child was declared in imminent danger.[1]

The Department filed a Child Protective Act (CPA) petition, alleging Child was without proper parental care and control, or subsistence, medical or other care or control necessary for her well-being because of Doe's neglect and/or Child was neglected, abused, abandoned, homeless, or lacked a stable home environment. Following a shelter care hearing, Child was placed in the custody of the Department. An adjudicatory hearing was held, and a case plan was approved by the magistrate court. The initial permanency plan was for reunification, but the Department subsequently moved to amend the permanency plan to termination of Doe's parental rights and adoption of Child. Following a termination trial, the magistrate court found Doe neglected Child and it is in Child's best interests to terminate Doe's parental rights.[2] Doe appeals.

---

[1]     This was Child's second removal from Doe's home. The first Child Protective Act case was opened December 20, 2020, and closed February 16, 2022. This case was opened November 1, 2022. When aggregating the two cases, by the time of the termination trial in this case, Child had been in the custody of the Department for forty-four of the previous fifty-two months.

[2]     The parental rights of Child's mother are not at issue in this case.

## II.

## STANDARD OF REVIEW

On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245-46, 220 P.3d 1062, 1064-65 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Id.* The Idaho Supreme Court has also said that the substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence than in cases where a mere preponderance is required. *State v. Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *Roe v. Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the magistrate court's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

## III.

## ANALYSIS

On appeal, Doe challenges the magistrate court's finding that Doe neglected Child pursuant to Idaho Code § 16-2002(3)(b), by failing to complete the case plan. Doe argues the magistrate court found that Doe failed to achieve the case-plan *goal* of maintaining a safe and stable home, but the statute requires proof of failure to complete a specific case-plan *task*. Doe also challenges the magistrate court's finding that Doe was unable to discharge his parental responsibilities pursuant to I.C. § 16-2005(1)(d) because the magistrate court failed to identify Doe's specific health conditions that rendered him unable to discharge his parental duties and failed to explain how those conditions would, for a prolonged and indeterminate period, be injurious to Child's well-being. Finally, Doe argues the magistrate court erred in finding it is in Child's best interests to terminate Doe's parental rights.

### A. Statutory Basis for Termination

A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). Implicit in the

Termination of Parent and Child Relationship Act is the philosophy that, wherever possible, family life should be strengthened and preserved. I.C. § 16-2001(2). Therefore, the requisites of due process must be met when terminating the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the grounds for terminating a parent-child relationship be proved by clear and convincing evidence. *Id.* Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *see also* I.C. § 16-2009; *Doe v. Dep't of Health & Welfare*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *Doe*, 143 Idaho at 386, 146 P.3d at 652.

### a. Neglect

Idaho Code § 16-2005 permits a party to petition the court for termination of the parent-child relationship when it is in the child's best interests and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *Doe*, 144 Idaho at 842, 172 P.3d at 1117.

Idaho Code § 16-2002(3)(a) defines "neglect" as any conduct included in I.C. § 16-1602(31). Section 16-1602(31)(a) provides, in pertinent part, that a child is neglected when the child is without proper parental care and control, or subsistence, medical or other care or control necessary for his or her well-being because of the conduct or omission of his or her parents, guardian, or other custodian or their neglect or refusal to provide them. Neglect also exists where the parent has failed to comply with the court's orders or the case plan in a CPA case and the Department has had temporary or legal custody of the child for fifteen of the most recent twenty-two months and reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the Department. I.C. § 16-2002(3)(b).

The magistrate court found that although Doe completed some of the case plan tasks, he did not complete "his case plan in key aspects." Specifically, the magistrate court found Doe failed to complete tasks 1B, 1D, 1E, and 1H of the Conditions to Return Home and failed to complete

tasks 1C, 1D, 1F, and 1G of the Conditions for Case Closure. The Conditions to Return Home were designed to address the safety concern that "Conditions of the home were hazardous. Child was being the caregiver to the parents in the home."

Task 1B required Doe to "participate in any medical appointment pertaining to Child's well[-]being." On direct examination by the State, Doe was questioned about the case plan and agreed that he had reviewed the case plan, was familiar with what he was required to do, and understood he needed to demonstrate progress on the tasks. Doe testified that he did not consistently attend Child's medical appointments or engage in her medical or educational care. Doe claimed he either did not know about the appointments and/or could not get a ride. However, the testimony from Brevney Morales, the caseworker, was that she, Doe, and the foster parent were included in a group text message thread and anytime Morales was notified of an appointment, Doe was also notified. Morales also testified that if she was notified of any appointments outside of the group message, she informed Doe of those appointments. To the extent there was conflicting evidence presented at the trial, this Court does not reweigh evidence, but "defer[s] to the trial court's unique ability to 'accurately weigh the evidence and judge the demeanor of the witnesses and take into account the trial court's 'superior view of the entire situation.'" *In re Doe*, 156 Idaho 103, 108, 320 P.3d 1262, 1267 (2014) (quoting *Doe v. Doe*, 148 Idaho 243, 246, 220 P.3d 1062, 1065 (2009)).

Task 1D required Doe to "attend and participate in weekly visitation with [Child]." The testimony at trial established that Doe engaged in supervised visitation with Child when he was not hospitalized. Caseworker Morales testified that during visitation, Doe and Child had "surface level" interactions and Morales did not ever observe that Doe was able to appropriately parent Child as opposed to just "hang out" with Child. The individual who supervised the visits provided similar testimony. The magistrate court found that Doe's engagement with Child was only at a superficial level and Doe's inability to comply with some of Child's requests left Child feeling unsupported.

Task 1E required Doe to follow the recommendations of his health care providers and to "work with a service provider approved by the Department to learn about his physical health and how to properly care for his body independently." Doe testified on direct examination that he was aware of what his treatment providers advised him to do. Doe agreed he was morbidly obese and pre-diabetic and had primary pulmonary hypertension, congestive heart failure, obstructive sleep

apnea, and a nicotine dependence. Doe acknowledged that nicotine products were not recommended for someone in his condition and nicotine use created additional heart issues and inhibited wound healing. Doe also testified he has had a recurring problem with open wound care that required hospitalization. Doe testified that despite these conditions, he could manage and complete all self-care and independent living activities. The Department then impeached Doe with the progress notes from the rehabilitation facility in which he was living at the time of the termination trial. For example, Doe agreed with the progress note that stated Doe's standing tolerance was 2.5 minutes. Doe also acknowledged that he needed assistance with toileting hygiene.

Thereafter, on cross-examination by the Department, Doe was confronted with the occupational therapy and physical therapy discharge notes. The occupational therapy discharge notes indicated Doe was discharged after less than a month of treatment and Doe was not interested in performing occupational therapy. Doe agreed that at the time of discharge, he still had some short-term and long-term goals that were unmet. The physical therapy discharge notes indicated numerous missed appointments. The stated reason for many of the missed appointments was that Doe was not interested in therapy on the days at issue and declined treatment. While Doe indicated he did not remember missing the appointments, he ultimately agreed that his participation in physical therapy had been lacking.

The magistrate court found that Doe was hospitalized at the onset of the CPA case following a medical procedure. Thereafter, Doe was given certain treatment protocols to assist him with how to move and complete daily living activities without tearing his wound, including occupational and physical therapy. The magistrate court found Doe was discharged from occupational therapy because he refused to participate. Similarly, the magistrate court found Doe did not consistently attend physical therapy or follow medical advice to lose weight; had not stopped using nicotine; and over the course of the child protection case, spent a significant amount of time in a rehabilitation facility due to his medical issues and other health complications that arose from the earlier medical procedure. At the time of the termination trial, Doe was still in a rehabilitation facility.

The magistrate court detailed Doe's health concerns, as noted above, and found that ultimately, those conditions rendered Doe unable to stand or walk for more than 2.5 minutes; Doe

6

could not toilet, bathe, or dress independently; and Doe had been hospitalized for months at a time because of those health issues.

Task 1H required Doe to work with a service provider to "maintain and promote appropriate living conditions." Doe testified that during the pendency of the case, he was only home for about six months between hospitalizations and during that time, he was able to keep the house clean with help from his roommates. However, Caseworker Morales testified that one of the roommates was not approved by the Department to live in the home and in order for Child to be able to return to the home, that individual would have to leave.

The magistrate court noted that at the time of the termination trial, although Doe had a residence, he had not lived at the residence for a significant amount of time because of his inpatient care; Doe allowed other people to reside in the home and relied on them for assistance with household chores and transportation; and Doe still lived in a rehabilitation facility and was not able to complete all of his daily life activities independently. The magistrate court also noted that Doe's health conditions, by Doe's own admission, prohibited him from engaging in household cleaning and Doe had no plan in place for assistance with these activities.

As to the Conditions for Case Closure, Task 1C required Doe to "actively participate in a parenting class approved by the Department," demonstrate an increased knowledge of parenting skills, and provide the Department with a certificate of completion. As part of this task, Doe underwent a psychological evaluation to assess his psychological functioning, his capacity to parent Child, and to determine if there were any psychological factors that impeded his ability to appropriately parent Child. Although Doe completed a parenting class, the examiner found that Doe "consistently denied the risk factors and problems that brought [Child] into foster care." The examiner noted that Doe displayed very little understanding or empathy for Child's situation while living in his care and displayed a consistent pattern of unwillingness to put Child's needs before his own. The examiner also noted concern about Doe putting Child in the position of caregiver and Doe's lack of appropriate parental boundaries, which included Doe showering with Child in the area and requiring Child to apply lotion to Doe's body, help him get dressed, and sleep in his bed. The examiner ultimately concluded that Doe is "unable to independently parent [Child] in an appropriate, healthy and safe manner, understand her needs, and meet her needs."

The magistrate court adopted those factual findings and concluded that Doe's situation will not change based on Doe's denial of the situation and the harm it poses to Child. The magistrate

court noted this was the second time Child had been removed from Doe's care for similar safety concerns, and Doe's unwillingness to recognize the safety issues and make the necessary changes, despite a prolonged opportunity to do so, demonstrated Doe's inability to discharge his parental responsibilities and it was unclear Doe would ever sufficiently change his lifestyle to be able to appropriately parent Child.

Task 1D required Doe to "continue to participate in [Child]'s healthcare by being involved in appointments." As noted above, Doe failed to complete this task. Task 1F required Doe to actively participate in education surrounding his physical and mental health and demonstrate an increased knowledge of self-care. With regard to Doe's mental health, as noted above, the psychological evaluation found that Doe sees no need to change his behavior regarding his parenting and it is likely the same risk factors would recur. Also noted above, Doe failed to follow the advice or recommendations of his health care providers and thus, failed to make progress with regard to his physical health. Task 1G required Doe to maintain "a safe and stable home environment for a minimum of four months free from illegal substances or harm." Related to this task was Doe's ability to address his physical health issues, which, as noted at length above, Doe declined to do.

Doe argues the magistrate court erred by misapplying I.C. § 16-2002(3)(b) because the magistrate court's finding that Doe "failed to demonstrate the ability to safely parent [Child] and meet her needs" was an "overarching goal," not a specific task, and thus, was an improper basis upon which to find neglect. We disagree. The magistrate court found that Doe failed to complete eight of the specific tasks set forth in the case plan. The failure to complete the relevant tasks necessarily means Doe was unable to achieve the goal designed to address the risk of harm that brought Child into the Department's custody. Substantial and competent evidence in the record supports the magistrate court's findings.

Doe also argues that Caseworker Morales testified based upon Doe's hospital discharge summaries and facility reports that were not admitted into evidence. Doe argues the magistrate court erred in treating Morales as "expert-like" because Morales was not an expert pursuant to Idaho Rule of Evidence 702, and thus, "could not explain the medical significance of [Doe's] therapy participation, wound care, or weight." However, Doe fails to cite to the record in the argument section of his brief regarding the magistrate court's ruling, Morales' objectionable testimony, or any factual support for the claim that Morales was not properly qualified as an

8

"expert-like" witness. *See* I.A.R. 35(a)(6) ("The argument shall contain the contentions of the appellant with respect to the issues presented on appeal, the reasons therefor, with citations to the authorities, statutes and parts of the transcript and record relied upon."). Doe similarly fails to provide any authority to support his claim. This Court generally does not address issues not supported by cogent argument and citation to legal authority, even in a case terminating parental rights. *Idaho Dep't of Health & Welfare v. Doe (2018-24)*, 164 Idaho 143, 147, 426 P.3d 1243, 1247 (2018). Moreover, contrary to Doe's assertion, Morales did not "explain the medical significance of [Doe's] therapy participation, wound care, or weight." Instead, Morales was asked whether, based on her review of the records, Doe was in compliance with his physical health treatment plan as it related to case plan task 1E (that Doe follow the recommendations of his health care providers). As a result, we decline to find any error for admitting the testimony on this ground.

Doe also argues the medical records could not be admitted pursuant to I.R.E. 803(6) or (8), the business records exception and public records exception, respectively, and presumably, could not be the basis for Morales' testimony. First, the records were never admitted; thus, we need not address whether the records might have been admissible pursuant to these rules because there is no evidentiary error for this Court to review. Second, because we hold Doe has waived any challenge to Morales' testimony, we need not address the speculative alternate basis to admit the evidence.

Doe argues his testimony that the Department elicited through impeaching him with the hospital discharge summaries cannot be considered direct evidence. Doe cites to no authority that stands for the proposition that testimony elicited on direct or cross-examination, either for impeachment purposes or any other purpose, is not direct evidence and cannot be considered by the trial court. Consequently, we decline to consider this argument. *Doe (2018-24)*, 164 Idaho at 147, 426 P.3d at 1247.

Finally, Doe argues the error in admitting the testimony from Doe and Morales was not harmless. However, because we hold there was no error in admitting the evidence, we need not address whether any alleged error was harmless.

In light of the above, the magistrate court did not err in admitting the testimony of Morales or Doe, or in considering their testimony when concluding Doe neglected Child. Because Doe has established no error, we need not address his harmless error argument. Thus, the magistrate court

9

did not err in concluding Doe neglected Child by failing to complete the case plan as set forth in I.C. § 16-2002(3)(b).

### b. Inability to discharge parental responsibilities

The magistrate court also found Doe was unable to discharge his parental responsibilities pursuant to I.C. § 16-2005(1)(d). Doe argues the magistrate court erred by misapplying I.C. § 16-2005(1)(d) by failing to identify Doe's specific health conditions and failing to explain how those health conditions would, for a prolonged and indeterminate period, be injurious to Child's well-being.

The magistrate court listed Doe's chronic health conditions and noted that those health conditions required long-term, in-patient care. The magistrate court then found that due to Doe's health issues and Doe's refusal to participate in occupational and physical therapy to remediate some of those issues, there was a risk that Child would again be put in the position of his caregiver. The magistrate court also found Doe's health issues prevented him from maintaining a sanitary home, and Doe himself acknowledged that he was unsure he could perform housecleaning tasks. Thus, contrary to Doe's argument, the magistrate court identified Doe's specific health issues and how they impacted his ability to parent Child.

Doe argues there was insufficient evidence to prove his conditions would be prolonged or indeterminate. We disagree. The record provides sufficient and competent evidence that Doe was living in a rehabilitation facility for the majority of the case and was still living there at the time of the termination trial. Additionally, the record also establishes that Doe failed to follow the advice or recommendations of his medical care providers that would address the medical circumstances that required hospitalization. Thus, Doe's long-term in-patient care during the pendency of the case and the likelihood that Doe's medical conditions will continue to require long-term in-patient care, demonstrate Doe was unable to discharge his parental responsibilities and would be unlikely to do so for a prolonged and indeterminate period of time. There was sufficient and competent evidence to support the magistrate court's findings that Doe could not care for his own needs and was not in a position to do so for Child. The magistrate court considered the history of the case, including that Child had been removed from Doe's care twice for the same safety concerns; the significant amount of time Doe spent in rehabilitation facilities; Doe's refusal to address his health issues; Doe's admission he could not live independently and required assistance with taking care of himself and keeping a home clean; and Doe's failure to arrange for

any services to assist him in independent living. The magistrate court did not err in concluding Doe was unable to discharge his parental responsibilities pursuant to I.C. § 16-2005(1)(d).

**B.     Best Interests**

Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the child to terminate the parent-child relationship. *Tanner v. State, Dep't of Health & Welfare*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). When determining whether termination is in the child's best interests, the trial court may consider the parent's history with substance abuse, the stability and permanency of the home, the unemployment of the parent, the financial contribution of the parent to the child's care after the child is placed in protective custody, the improvement of the child while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law. *Doe (2015-03) v. Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015); *Idaho Dep't of Health & Welfare v. Doe*, 156 Idaho 103, 111, 320 P.3d 1262, 1270 (2014). A finding that it is in the best interests of the child to terminate parental rights must still be made upon objective grounds. *Idaho Dep't of Health & Welfare v. Doe*, 152 Idaho 953, 956-57, 277 P.3d 400, 403-04 (Ct. App. 2012).

The magistrate court found, and substantial evidence supports, that prior to Child's removal, Doe had Child acting as his caregiver. The magistrate court found Doe's chronic and significant health conditions pose a safety risk for Child and that if Child were returned to the home, Child will again be put in a position as Doe's caregiver. At the time of her removal, Child was socially isolated and had untreated medical and developmental issues. The magistrate court noted this was Child's second removal and the prior removal was for similar safety issues, which included neglect, a hazardous home, and a concern Child was having to act as a caregiver for Doe.

Child's well-being has improved in foster care. The foster parents, who desire to adopt Child, have provided the necessary medical care that Doe failed to provide and have promoted socially appropriate developmental opportunities for Child. Child is also in counseling to address her emotional health. Child has become physically and emotionally healthier than she was when she lived with Doe, has access to age-appropriate social activities, and is happy and well-adjusted to her foster family.

Doe argues the magistrate court erred in terminating Doe's parental rights based on the speculative possibility that Child might again become Doe's caregiver because there was no evidence that Child had acted as Doe's caregiver. We disagree. First, there was testimony that

11

Doe's expectations of Child to assist Doe with his care and with other household obligations was a form of "parentifying" a child. Doe admitted at the time of removal that he "supervised" Child's cleaning of the home because he could not do the cleaning on his own. Notably, the house was not just messy, but so filthy and unsanitary that law enforcement declared some of it unusable. Moreover, Doe's lack of insight into his parenting and his unwillingness to do anything differently increases the risk of Child continuing to act as Doe's caregiver. The magistrate court did not engage in speculation, but rather, looked at the history of the case, Doe's previous actions and unwillingness to change his behavior, and concluded it was likely that a similar scenario would arise in the future. The magistrate court did not err in concluding that terminating Doe's parental rights is in the best interests of Child.

Doe also argues the benefits Child has received in foster care did not, by themselves, justify terminating Doe's parental rights. The magistrate court did not conclude that termination is in the best interests of Child based solely on the benefits Child received. Instead, the magistrate court considered all the relevant factors, including the risks Child faced if returned to Doe's care, and concluded termination of Doe's parental rights is in Child's best interests. This finding is supported by substantial and competent evidence, and thus, the magistrate court did not err in so finding.

## IV.

## CONCLUSION

The magistrate court did not err in finding that Doe neglected Child, was unable to discharge his parental responsibilities, and that termination of Doe's parental rights is in Child's best interests because its findings are supported by substantial and competent evidence. Therefore, the judgment terminating Doe's parental rights is affirmed.

Judge LORELLO and Judge TRIBE, **CONCUR**.